UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TYRONE WILSON                               CIVIL ACTION

VERSUS                                      NUMBER: 11-2803

BURL CAIN                                   SECTION: "G"(5)


**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief and supplemental application for habeas relief of petitioner, Tyrone Wilson, and the State's opposition. (Rec. docs. 1, 10, 12).  Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that the instant petition be dismissed with prejudice.

**PROCEDURAL HISTORY**[1]

Petitioner Wilson is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola,

---

[1]A portion of the procedural history has been taken from the Louisiana Fourth Circuit Court of Appeal's opinion, State v. Wilson, 68 So.3d 1031 (La. App. 4 Cir. 2010).

Louisiana.   On August 11, 2005, Wilson and his co-defendant, Hampton Franklin, were indicted for armed robbery (count one) and aggravated rape (count two).[2]  Wilson pleaded not guilty to both charges but, on December 7, 2007, following a five day trial in Orleans Parish Criminal District Court, Wilson was found guilty as charged on both counts.   His motions for a new trial and post-verdict judgment of acquittal were denied.   On November 3, 2008, Wilson was sentenced on count one (armed robbery) to serve twenty-five years at hard labor with credit for time served.   On count two (aggravated rape), Wilson was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, to run concurrently with his sentence on count one and with any other sentence.

On February 17, 2010, the Louisiana Fourth Circuit Court of Appeal affirmed Wilson's convictions and sentences.   <u>State v.</u>

---

[2]On July 20, 2009, the state amended the aggravated rape charge (count two) to forcible rape (La. Rev.Stat. 14:42.1) as to Franklin. Franklin pleaded guilty as charged to armed robbery (count one) and guilty to the amended charge of forcible rape. On July 22, 2009, he was sentenced on count one to serve fifty years at hard labor with credit for time served but without benefit of parole, probation or suspension of sentence.  The sentence was ordered to be served concurrently with his sentence on count two and with any other sentence.  On count two he was sentenced to serve forty years at hard labor with credit for time served but without benefit of parole, probation or suspension of sentence.

Wilson, 68 So.3d 1031 (La. App. 4 Cir. 2010). On October 15, 2010, the Louisiana Supreme Court denied Wilson's writ application. State v. Wilson, 45 So.3d 1110 (La. 2010). Wilson did not file a writ of certiorari with the United States Supreme Court.

As evidenced in the Orleans Parish Criminal District Court docket master, on February 8, 2011, Wilson filed a post-conviction application which the district court denied on that date. (St. rec., supplemental vol. 1). On May 12, 2011, Wilson appears to have filed a writ application with the Louisiana Fourth Circuit Court of Appeal. (St. rec., supplemental vol. 1).[3] On June 15, 2011, the Louisiana Fourth Circuit denied Wilson's writ application. State v. Wilson, No. 2011-K-0738 (La. App. 4 Cir. 2011) (unpublished opinion). (St. rec., supplemental vol. 1). On July 6, 2011, Wilson filed a post-conviction writ application, No. 11-KH-1636, with the Louisiana Supreme Court. (St. rec., supplemental vol. 1). Wilson's writ application was still pending before the state high court when this matter was filed.

---

[3]May 12, 2011 represents the date Wilson signed his pleading. Wilson, however, used the post-conviction form generally used in seeking post-conviction relief from the state district court. However, the pleading is file-stamped by the Clerk of Court for the Louisiana Fourth Circuit and has the case number, 2011-K-0738, applicable to his state appellate court writ application. Wilson also filed a handwritten "Application for Post-Conviction Relief (st. rec., supplemental vol. 1) with the Louisiana Fourth Circuit.

3

In October, 2011, Wilson filed the instant habeas corpus application.[4] In his habeas application, Wilson raises the following claims: (1) he received ineffective assistance of counsel; (2) there was insufficient evidence to support his convictions; and, (3) his right to a fair trial was violated because the jury, in reaching its guilty verdict, improperly considered the fact that he did not testify and that none of his family spoke on his behalf.

In its response (rec. doc. 12, p. 12), the State does not challenge the fact that Wilson's habeas application is timely. The State does, however, contend that Wilson has not exhausted his state court remedies, as required under Rose v. Lundy, 455 U.S. 509 (1982), due to his failure to bring claim (3) before all the state

_____

[4]In determining a petitioner's filing date, the Court uses the "mailbox rule," pursuant to which a pleading filed by a prisoner acting pro se is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing. Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Generally, the date a prisoner signs his petition is presumed to be the date he delivered it to prison officials for mailing and, therefore, the filing date. Colarte v. Leblanc, 40 F.Supp.2d 816, 817 (E.D. La. 1999). Alternatively, if no signing date is available, the Court will generally look to the post-marked date on the envelope in which the application was mailed.
In the instant matter, the post-marked date is indecipherable. As for the signing date, while the month, October, and year, 2011, are apparent, the day Wilson signed his application is unclear because Wilson crossed-out the day. However, because the timeliness of the instant action is not at issue, it is not essential that the precise filing date be ascertained.

4

courts and because he currently has a writ application pending before the Louisiana Supreme Court. (Rec. doc. 12, pp. 11-12).[5]

Despite Wilson's failure to exhaust his state court remedies, this Court will nevertheless address the merits of Wilson's claims. Under the provisions of 28 U.S.C. §2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**FACTS**[6]

Detective Michael McCleery[7] of the New Orleans Police Department (NOPD) Sex Crime Unit testified that on June 19, 2005, he was notified that a sexual assault had occurred on the Newcomb College Campus of Tulane University. Upon arriving at the university he was informed that there were two crime scenes. The

---

[5]The Court's staff confirmed, via a telephone call to the Clerk's Office for the Louisiana Supreme Court, that Wilson's writ application was pending before the state high court when he tendered his current federal filing.

[6]The facts have been taken from the Louisiana Fourth Circuit Court of Appeal's opinion, Wilson, 68 So.3d at 1033-1039.

[7]In its opinion, the Louisiana Fourth Circuit refers to the investigating officer as "Detective McCleary." However, in the Detective's police report (st. rec., vol. 2, p. 348), he spells his name "McCleery". Accordingly, the Court will amend the state court's factual recitation, along with its reasoning, to the extent the court refers to the officer as "McCleary" rather than "McCleery".

primary crime scene where the assault occurred was an office inside the Woldenberg Art Center. The secondary crime scene was the corner of Broadway and Plum Streets where the suspects, who were chased off the campus, dropped a bag of items.

Detective McCleery observed that the office was in disarray. The desk telephone was smudged with bloody fingerprints and had been ripped from the wall. A trash can was searched for condoms; none were found. A jacket was lying on the floor, and a bicycle was leaning against the wall. On a shelf were several liquor bottles. Blood was observed on the floor. Detective McCleery secured the scene with crime tape and notified the crime lab. The crime lab processed the area for blood, semen, fingerprints and other body fluids. Blood and body fluid samples were taken. Several blood smudged fingerprints were lifted from the inside office doors and the desk telephone. In the hallway, Detective McCleery observed a green cloth bag and a plastic toy gun which were retrieved from the corner of Broadway and Plum Streets by Steven Durow, who chased the two suspects from the Woldenberg Center. Durow turned the toy gun over to the Tulane police, who placed it and the bag inside the hallway for processing.

The corner of Broadway and Plum Streets was also secured with crime tape. At the scene a paper bag was observed containing a

broken bottle of Courvoisier Liquor and some loose change. The scene was processed by the crime lab.

Detective McCleery drove to the hospital where he retrieved the victim's clothes. He interviewed the victim. She was shaken and had a large laceration to the bridge of her nose. Her eyes were bloodshot, and she seemed confused and dazed. She gave a description of both attackers. Detective McCleery solicited help from the public through Crime Stoppers which resulted in the defendant and Franklin being developed as suspects. Photographic line-ups of the defendant and Franklin were prepared and placed in a folder. The victim was contacted, and an appointment was set for her to view the photographs. She was given the folder and told to open it and view the photographs to see if she recognized anyone. Upon viewing the first set of photographs the victim started shaking as she positively identified the photograph of Hampton Franklin. She signed, dated and noted the time on the back of Franklin's photograph. She initialed the other photographs indicating that she had viewed them. Upon viewing the second line up the victim started shaking as she positively identified the photograph of the defendant. She signed, dated and noted the time on the back of defendant's photograph. She initialed the other photographs indicating that she had viewed them. Arrest and search warrants were obtained for both suspects. Two white t-shirts and

a pair of jeans were seized from the defendant's home.  One t-shirt
appeared to have red stains on it.  No weapon or other evidence was
found.  The defendant was not home at the time of the search but
later that evening he turned himself into the police.  Franklin was
arrested at his home; nothing was seized from his residence.

On cross-examination, Detective McCleery stated that the crime
lab collected all evidence at both crime scenes, all blood samples
tested positive for the victim's blood, and no seminal fluid was
found.  He conceded that although several fingerprint samples were
examined, they did not match the defendant and one blood smudged
fingerprint revealed male DNA, but excluded the defendant.
Detective McCleery also stated that in his communications with the
victim, she did not give a description of defendant's hair or his
hair style but that the individuals in the photographic line-up
were wearing short twists in their hair because the most recent
photo of defendant showed him wearing short twists.  In addition,
Detective McCleery testified that the victim mentioned that
Franklin asked the defendant for a condom but did not know if
either man wore a condom during the assault.

On re-direct examination, Detective McCleery stated that he
was not surprised that the fingerprints did not reveal a match to
defendant or Franklin because the crime scene was a public place

visited by many people.  On re-cross examination, he conceded that
thirty latent fingerprints were recovered from the outside door to
the art center and that none was a match to defendant.

Alyson Saadi, a DNA analyst with the State Police Crime Lab,
testified that he tested the victim's shirt, underwear, jeans and
tennis shoes, as well as the defendant's jeans and t-shirt, several
cuttings from an office chair, various swabs of blood, suspected
body fluids taken from the floor of the office, and a latent
fingerprint on an exterior door.  All the blood samples tested
positive for the victim.  The latent fingerprint tested positive
for the victim's DNA profile and that of an unknown male.  The male
DNA was compared to that of defendant and Franklin; both were
excluded.  The blood swab from the bottom of the right tennis shoe
also showed an unknown male profile which was not suitable for
comparison.  A hair was recovered from the zipper of the
defendant's jeans but it was not a match to the victim.

On cross-examination, Ms. Saadi confirmed that the male DNA
sample on the bottom of the victim's shoe excluded the defendant
and the hair taken from defendant's jeans also excluded the victim.
On re-cross examination by the state she stated that the hair found
on defendant's jeans was a long brownish colored hair and on re-
recross examination by the defense she stated that mitochondrial

tests showed that the hair was not a match to the victim or any of her relatives.

Tanesha Santemore, a criminalist with the New Orleans Police Department, testified that she tested a black cotton sports bra, a pair of white cotton underwear, a cotton t-shirt and a pair of orange and yellow tennis shoes taken from the victim. Blood was found on the tops and bottoms of both of the tennis shoes, the underwear, the jeans, and the t-shirt. No blood was found on the bra. Hairs were also found on several items but were not tested. Cuttings of reddish stains were taken from the defendant's t-shirt and locked in the lab for further testing. However, because of the destruction to the lab which occurred in the aftermath of Hurricane Katrina, no testing was possible.

On cross-examination by the defense, Ms. Santemore testified that the reddish stains could have come from sources other than blood.

Sergeant Robert Blanchard, day watch supervisor of the New Orleans Police Department Evidence and Property Division, testified that following the aftermath of Hurricane Katrina most of the evidence stored in the evidence and property room was destroyed, floated away, or was unable to be identified.

Anna Duggar, director of the New Orleans Police Department

Crime Lab, testified that in June 2005 she was a criminalist assigned to the forensic light unit and that her specialization was blood spatter pattern analysis, latent fingerprint analysis and comparison, serology, DNA preparation and analysis of hair and fiber evidence. She stated that she examined the crime scene in this case for body fluids and that fluorescence tests indicated possible evidence of saliva, seminal fluid or urine. In addition, two latent fingerprints were recovered from the outside office door where the rapes occurred.

On cross-examination, she stated that the latent fingerprints were subsequently found not suitable for comparison, thirty additional latent fingerprints lifted from the crime scene were compared to defendant but none matched, and seven suspected semen stains were recovered but none were positive for semen.

Betty Jo Mitchell, a forensic sexual assault nurse examiner, testified that on June 19, 2005, she examined the victim at Charity Hospital's emergency accident room. The victim had a severe laceration to the face and was hysterical. She told Nurse Mitchell that she had been penetrated orally, vaginally and anally, and that the attackers used a condom during the vaginal and anal assaults. Nurse Mitchell collected trace evidence samples and swabs from the victim's hair, mouth, fingernails, vagina and rectum. The victim's

body was examined with a strobe light for the presence of semen and other body fluids. No tears were found in the vagina. A polyp was observed inside the vaginal vault which was broken and bleeding. The victim's cervix was red which indicated trauma. The anal exam did not reveal any tears, abrasions, redness or swelling.

On cross-examination by the defense, Nurse Mitchell stated that no forensic evidence was found in the victim's hair and none of the swabs tested positive for semen. No body fluids were found on the victim's body.

The victim testified that on June 19, 2005, at approximately 1:00 p.m., she was a senior curator for the Newcomb College Art Gallery at Tulane University, working in her office in the Woldenberg Art Center. She heard a knock on the door, and a voice asked, "Can you tell me where room 215 is?" She answered through the door, "It's upstairs on the second floor." Within seconds, she heard a second knock at the door. A voice said, "We can't find 215." She opened the door and saw Hampton Franklin standing in the doorway, wearing a white t-shirt and white jeans. Franklin said, "I'm looking for 215." She answered, "You have to go upstairs." Franklin replied, "Well, in that case, give me all your money, bitch. Give me all your money, bitch." Franklin lifted up his shirt and showed her a semi-automatic pistol. Dumbfounded, she

stood in the doorway trying to understand what was happening. At that point she saw the defendant standing at the end of the hallway wearing a white t-shirt and dark blue jeans. Franklin moved toward her and ran into the office, then the defendant followed and slammed and locked the door.

The defendant ordered the victim to sit on the floor. He placed the muzzle of a gun on the top of her head. Franklin screamed, "Where is your money, bitch? I know you got money in here. Where is your money?" She responded that she only had thirteen dollars in her pocket; he demanded it, and she gave it to him. Franklin ransacked the office looking for valuables. Defendant told the victim, "I know you must think that you are having a crappy Father's Day, but we ain't got no fathers." They asked the victim for her purse and she responded that she carried a knapsack, not a purse, and that the knapsack was inside her car. The defendant demanded her car keys and a description of her car. When she replied with the information, he accused her of lying and struck her across the face with the barrel of the gun. She told him that she was not lying. He grabbed the car keys from her desk. He ordered the victim not to look at him and placed the gun to her temple. Franklin screamed that the victim was going to call the police. She assured them that she would not. Franklin continued screaming that she was going to call the police; he picked up her

desk phone and ripped it out of the wall. The defendant kept the gun to her head. Franklin then went inside the annex where office and reception equipment and supplies were stored. The defendant said, "Well, now you can suck my dick." He then forced the victim to perform oral sex on him while holding the gun to her temple. After a short while, defendant moved to one of the office chairs. Because he was not circumcised he gave the victim instructions about how to pull the skin back from his penis, to use her hands and to watch her teeth. Franklin returned to the office carrying a bottle of Courvoisier liquor and a digital camera. He asked the defendant if he had a condom; the defendant took one out of his pocket and handed it to Franklin. Franklin ordered the victim to stand up and remove her pants. When she did not pull them down far enough, he grabbed them and pulled them down to her knees. He pushed her back down onto defendant's lap, put on the condom and raped her anally. The defendant and Franklin then changed positions with Franklin sitting in the chair. Franklin grabbed the victim's head and pushed it into his lap. At this point, she lost her balance and brushed against the gun; Franklin threatened her about reaching for the gun. The defendant put on a condom and raped the victim vaginally and anally.

The victim described the rapes as becoming more violent and vicious. She felt that she was going to die. Something inside of

her snapped and she decided that if she was going to die she was not going down as a lamb.  She put her hands underneath the chair and with all of her strength she threw the chair over knocking Franklin onto his back.  She grabbed her pants, turned around, and looked at the defendant.  She described defendant as looking dumbfounded and kind of confused, like this was not part of the plan.  Observing that the gun was now lying on the arm of the chair, the victim ran towards the door. In an attempt to flee, the defendant ran past her and knocked her back into the door and wall.  Franklin ran past her knocking her back into the office.  Before he fled, Franklin picked up the gun and smashed her face, breaking her nose.  She slammed the door and locked it.

The victim stated that she was able to clearly see both men. She described the lighting conditions as good with both natural light from a window and light from two lamps.

She was bleeding profusely and, realizing that she could not use the phone, she walked around the office fearing that her attackers were outside in the hallway.  When she did not hear any sounds from the hallway, she opened the door and ran out of the building.  Using an emergency telephone she called the Tulane University Police and reported that she had been robbed.  A Tulane police officer transported her to Baptist Hospital where she told

the officer that she had been raped.  At the hospital, three police officers interviewed her and took her statement.  She described her attackers as two black teenagers between the ages of seventeen and nineteen and approximately five foot seven and five foot eight inches in height.  She described Franklin as having a darker complexion than the defendant.  Subsequently, she was transported to Charity Hospital for a rape examination.  Detective McCleery interviewed her at Charity Hospital.

On the Thursday following the rapes, Detective McCleery contacted the victim, informing her that he had some photographs he wanted her to view.  He came to her home with another detective. He gave her a manila folder, and said, "Could you please open it and look at it and see if you see anyone familiar?"  Upon viewing the first photographic line-up, the victim immediately and positively identified Franklin as the attacker who wore the white t-shirt and white pants.  Upon viewing the second photographic line-up, she immediately and positively identified the defendant as the attacker who wore the white t-shirt and dark jeans.  She signed and dated the backs of both photos.

On cross-examination, the victim positively identified the photographic line-ups shown to her by Detective McCleery and also positively identified the defendant's photograph.  She admitted

identifying the defendant as wearing his hair in twists when he raped her. She stated that Franklin was wearing short cropped hair and when the defendant ran into her office she observed that he was holding a gun. The victim testified that the defendant was not wearing a condom during fellatio but was wearing a condom when he sodomized her. Finally, she agreed that she lacked knowledge as to the growth rate of African-American hair.

On re-direct examination, the victim stated that when she testified at the November 2, 2006 motion hearing she described the defendant's hair as Chee Weez, twists, twigs or short-twisted braids. She described the defendant's hair in the photographic line-up as twisted braids.

On re-cross examination, the victim described Franklin's hair as close-cropped and defendant's as twigs. She did not observe either man as having tattoos, facial hair, scars or other distinguishing marks.

Samuel Gore, medical examiner at Orleans Parish Prison, testified that he examined the defendant and Franklin and determined that neither were circumcised.

Professor Stephen Durow testified that he was a graduate student in fine arts at Tulane University and at work in his studio in the Woldenberg Art Center on the day the victim was robbed and

raped.  While walking down the hallway towards the restroom, he observed two men exiting from the area of the victim's office carrying bags.  Both men were looking around to see if anyone was in the hallway and, because of their demeanor, Durow suspected that they had burglarized the office.  Upon seeing Durow, the men ran out of the building; Durow ran after them.  He described the men as thin, one slightly taller than the other with short hair.  He chased them for about two and one-half blocks down Plum Street towards Broadway.  During the chase one of the men turned and pointed what appeared to be a toy gun at Durow.  At the corner of Plum and Broadway Streets, the men dropped the items they were carrying.  When Durow realized that he was not going to catch them, he discontinued the chase.  Durow observed a plastic toy gun wrapped in electrical tape and several bottles of wine lying on the ground.  Fearing the plastic gun would become contaminated, Durow used his pen to pick it up.  He carried it back to the campus and turned it over to the Tulane Police.  The following morning, news of the rape was televised and a Tulane Police officer contacted Durow to ask if he had seen the news footage of the two arrested suspects.  He informed the officer that he only saw the end of the news, but that one of the men looked familiar.  He was not sure of the other man.  Subsequently, Detective McCleery showed him the news footage again.  Durow confirmed that both suspects looked like

the two men that he chased from the art center. Detective McCleery did not suggest in any way who the two men were or what he should say. In court, Durow positively identified the defendant as one of the two men he chased from the art center.

On cross-examination, Durow stated that he remembered that one of the men wore a black t-shirt, that both wore jeans, and that both had short cropped hair. One had light facial hair which looked like a goatee. He testified that he did not know if the gun was a toy but that "something didn't look right about it .... It just didn't look like a real gun." That night he was interviewed by Detective McCleery and gave him a statement. He was never shown either a live or a photographic line-up. Durow testified that he got more than a fleeting look at defendant because the defendant kept turning around to see if he was still chasing him.

On re-direct examination, Durow stated that the first night he viewed the televised news coverage he recognized that one of the suspects arrested for the rape was one of the men he chased from the art center.

Detective Kristi Bagneris of the NOPD testified that on June 23, 2005, she received a call from the second district station that an individual, later identified as the defendant, wanted to turn himself in. A check of the defendant's name revealed that there

was an outstanding warrant for his arrest. He was relocated to the sex crimes division at police headquarters. On the face sheet, Detective Bagneris did not note that she observed any obvious tattoos or facial hair on defendant.

On cross-examination, Detective Bagneris conceded that on the face sheet she noted that the defendant was an African-American male with a medium build, brown eyes with a short hairstyle. She did not note any tattoos, facial hair or braided hair.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

**MERITS**

### Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective

21

assistance of counsel is <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984), wherein the Court held that in order to prove that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the <u>Strickland</u> test, "it is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993), <u>citing</u> <u>Strickland</u>, 466 U.S. at 690. To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Wilson argues that counsel was ineffective in failing "to investigate, interview and subpena [sic] [an] alibi witness", specifically, Dottie Washington. (Rec. doc. 1, Wilson's writ of review, p. 3). Despite the fact Washington's identity and contact information were contained in Detective McCleery's police report

and, therefore, readily available, "counsel flatly failed to investigate and establish" this source of exculpatory evidence. (Rec. doc. 1, Wilson's "writ of review", p. 4).

A review of the pertinent portion of Detective McCleery's report reflects the following:

> [Dottie Washington] stated that she recalled Wilson coming over to her house a couple of times on Sunday, June 19, 2005 [the date of the crimes]. She did say that Wilson had come over early in the day because he was looking for his mother. He then came back over later in he day, with another male, and had some food. Detective McCleery asked Washington if she knew Franklin. Washington stated that she did not know Franklin personally, but that she had heard of him and seen him around. She also added that it was Franklin that Wilson was with when Wilson had eaten at her house and that Franklin had also eaten.
>
> Detective McCleery asked her if she knew anything about Wilson or had heard anything from anyone about Wilson. Washington stated that she only knew Wilson through her son, who is friends with Wilson's younger brother. Washington stated that she didn't know and has never heard anything about Wilson herself.
>
> Detective McCleery then asked Washington if she could recall what time Wilson had first come over looking for his mother, what time Wilson and Franklin had come over to eat, or what they were wearing. Washington stated that she had been drinking alcohol and "having a good time", so she was unable to say what times Wilson had come over or what Wilson or Franklin had been wearing.

(St. rec., vol. 2, pp. 347-348).

Based upon the above, the Court finds that counsel was neither deficient due to his failure to perform a follow-up interview with

Mrs. Washington nor was Wilson prejudiced by counsel's failure in this regard. Accordingly, Wilson has failed to pass Strickland's two-prong test.

**Insufficiency of Evidence**

Wilson argues that the evidence was insufficient to support his convictions because his identity as one of the perpetrators was not established. Wilson's argument in this regard is based upon the following. First, "while there was [sic] multiple finger prints found at the crime secne [sic] none of them match[ed] [his fingerprints]." Second, testing of DNA collected in connection with the crimes excluded him as a donor. (Rec. doc. 1, Wilson's writ of review, p. 7).[8]

With regard to the lack of physical evidence connecting Wilson to the crimes, DNA analyst, Alyson Saadi, testified that the "male DNA" recovered from the crime scene excluded both Wilson and Franklin. Wilson, 68 So.3d at 1035. Further, both Detective McCleery and criminalist Anna Duggar testified that none of the fingerprints lifted from the crime scene matched Wilson. Id. at 1034 and 1035-1036.

---

[8]Though not raised in his habeas application, Wilson, on direct appeal, also argued that his identification was not established due to the fact that portions of the victim's description were not corroborated. In an abundance of caution, the Court shall address this issue.

As for varying descriptions, the victim described Wilson as a clean-shaven, African-American wearing a white t-shirt and jeans, with his hair in "twists". <u>Id</u>. at 1038. In contrast, Durow stated that both men had "short cropped" hair and one was wearing a black t-shirt and had a goatee. <u>Id</u>. at 1038-1039. Detective Bagneris partially corroborated the victim's description, providing on the "face sheet" that Wilson had no facial hair. However, Bagneris, like Durow, noted that Wilson had a short hairstyle. Yet another descriptive source, a campus surveillance video from three days before the crimes, depicted Wilson as having a beard and close cropped hair. <u>Id</u>. at 1039.

Additionally, the victim stated that Wilson had no tattoos. The victim's observation in this regard was supported by Detective Kristi Bagneris who, in booking Wilson, "did not note any tattoos...." <u>Id</u>. at 1039. However, at trial, Wilson had tattoos on both of his forearms. <u>Id</u>.

In rejecting Wilson's insufficiency claim, the Louisiana Fourth Circuit Court of Appeal set forth applicable Supreme Court law, along with corresponding state law.

> [U]nder <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . we "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been

proved beyond a reasonable doubt." _State v. Neal_, 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing _State v. Captville_, 448 So.2d 676, 678 (La.1984)). When circumstantial evidence is used to prove the commission of the offense, La. Rev.Stat. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." _Neal_, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial, must be sufficient under _Jackson_ to prove guilt beyond a reasonable doubt to a rational jury. _Id._ (citing _State v. Rosiere_, 488 So.2d 965, 968 (La.1986)). When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. _State v. Bright_, 1998-0398 (La.4/11/00), 776 So.2d 1134, 1147. The fact-finder weighs the respective credibilities of the witnesses, and a reviewing court will generally not second-guess those determinations. _State ex rel. Graffagnino v. King_, 436 So.2d 559 (La.1983). However, the touchstone of _Jackson v. Virginia_ is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." _State v. Mussall_, 523 So.2d 1305, 1310 (La.1988). The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses, _State v. Hampton_, 98-0331 (La.4/23/99), 750 So.2d 867, 880, and we have repeatedly held that a factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. _State v. Huckabay_, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; _State v. Harris_, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. The testimony of the victim alone is sufficient to establish the elements of the offense of aggravated rape, even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. _State v. Lewis_, 97-2854 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1023; _State v. Carter_, 97-1096 (La.App. 4 Cir. 5/20/98), 713 So.2d 796.

<u>Wilson</u>, 68 So.3d at 1033.

Thereafter, the Louisiana Fourth Circuit examined the evidence supporting the jury's guilty verdict.

> [T]he victim, without hesitation, positively identified defendant at trial as her attacker. Accordingly, the defendant's contention that the victim identified someone else as her attacker is not supported by the record.
>
> The victim in this case was raped by the defendant and Franklin for over twenty minutes in her office, which was illuminated by both natural and artificial light. The defendant spoke to the victim several times and made no attempt to disguise his identity. The victim's description of defendant's age, weight and height were accurate. She described the attackers as ransacking the office and taking bottles of Courvoisier from the annex. Courvoisier liquor was the same brand dropped by the men chased off the campus. Durow testified that he saw the defendant and Franklin coming from the area of the victim's office, thereby establishing proximity to the crimes. In the hallway he got a full frontal view of both men and made eye contact with them before they fled. He testified that he got another look at defendant's face during the chase when the defendant turned around and pointed a gun at him. He was certain that he could identify the two men if he saw them again. Within days of the crime, Durow positively identified the defendant and Franklin from the television news footage. A tip from crime stoppers provided independent information as to the identity of the perpetrators which led to the photographic line-ups shown to the victim by Detective McCleery. Upon viewing the photographic line-up and without any prompting, the victim immediately and positively identified the defendant as one of the men who robbed and raped her. She steadfastly maintained her identification of defendant and positively identified him at trial. Upon his arrest and booking, Detective Bagneris did not observe any tattoos on defendant. Interestingly, the defendant does not argue that the campus surveillance video shows him as having tattoos on his forearms.

The victim testified that defendant was armed with a gun. The defendant and Franklin demanded money from the victim and took thirteen dollars and some change from her pocket, a camera and bottles of Courvoisier liquor from the victim's office area and adjoining annex.

The victim testified that the defendant and Franklin entered her office brandishing guns and that each threatened her and forced her to engage in oral, anal and vaginal sexual intercourse. Betty Jo Mitchell, the sexual assault nurse, testified that the results of the rape examination were consistent with the victim's account of the rapes. Furthermore, the medical report of the victim's broken and lacerated nose was consistent with the victim's testimony that she was struck with a gun. The victim had the opportunity to view the defendant for more than twenty minutes in a well lit office during daylight hours. The victim immediately and positively identified defendant in a photographic line-up (photograph number 5) four days after the rapes. The defendant has not alleged that the photographic line-up was suggestive or unconstitutional. Both the victim and Durow positively identified the defendant at trial. The jury was well aware of the discrepancies in the physical descriptions of the defendant by the victim and Durow, but weighed their testimony and found them to be credible. Given the facts of this case, we do not find that the jury abused its discretion by finding the identifications of the victim and Durow credible. Thus, there was sufficient evidence to negate any possibility of misidentification....

Id. at 1040-1041.

Based upon the above, the Court finds that the state appellate court's finding that the evidence was sufficient to support Wilson's convictions, specifically, that the evidence was sufficient to support Wilson's identification as one of the victim's assailants, does not represent an unreasonable application

of <u>Jackson</u> to the facts of this case.  Accordingly, the instant claim is without merit.

### C.  Improper Jury Deliberations

Wilson complains that he his constitutional right to a fair trial was violated because the jury, during its deliberations, improperly considered the fact that he did not testify on his own behalf, along with the fact that no members of his family spoke on his behalf.  In support of this claim, Wilson has provided a sworn statement from Elizabeth Cumming who "served as student counsel for defendant, Tyrone Wilson during the academic year 2007-2008."[9]  In her statement, Ms. Cumming's represents that one of the jurors, Dr. Robert Metheney, informed her via telephone  "that he and the other jurors thought it was negative that Tyrone Wilson could not speak for himself, even though he seemed to be from a nice middle class home."  Further, Dr. Metheney informed "that he and the other jurors talked about the lack of family members in the courtroom and the fact that no one spoke from his family."

"Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely

---

[9]A copy of Elizabeth Cumming's statement is attached as Exhibit C to Wilson's Supplementary Writ of Review, doc. 10.

on the basis of the evidence introduced at trial, and not on...circumstances not adduced as proof at trial.'" <u>Holbrook v. Flynn</u>, 475 U.S. 560, 567 (1986) (quoting <u>Taylor v. Kentucky</u>, 436 U.S. 478, 485 (1978)). As the Fifth Circuit explained, while a jury verdict may be attacked on the basis that jurors considered outside or extrinsic evidence, "(e.g., newspapers, statements by court personnel)," a "jury's internal deliberations cannot result in a mistrial." <u>United States v. Straach</u>, 987 F.2d 232, 241 (5th Cir. 1993).

In <u>United States v. Rodriquez</u>, 116 F.3d 1225, 1226 (8th Cir. 1997), it was ascertained, via a telephone conversation with a juror, that Rodriquez's failure to testify was discussed during jury deliberations. Rodriquez argued that because his failure to testify was not evidence introduced at trial, it should be considered an "outside influence" violative of his right to a fair trial. <u>Id</u>. The court, however, disagreed, providing:

> That Rodriquez did not testify is not a fact the jurors learned through outside contact, communication, or publicity. It did not enter the jury room through an external, prohibited route. **It was part of the trial, and was part of the information each juror collected.** It should not have been discussed by the jury, and indeed was the subject of a jury instruction to that effect. But it was not "extraneous information"....

<u>Id</u>. at 1227 (emphasis added). <u>See</u> <u>also</u> <u>Raley v. Ylst</u>, 470 F.3d

792, 803 (9th Cir. 2006), <u>cert</u>. <u>denied</u>, 552 U.S. 833, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007) ("The fact that petitioner did not testify in his own defense is not extrinsic evidence.").

Based upon the above, the Court finds that the fact that jurors, during deliberations, discussed the fact that Wilson did not testify and that his family was not present in court and did not testify on his behalf, did not violate Wilson's right to a fair trial.  Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the instant application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415,

1430 (5th Cir. 1996)(<u>en banc</u>).[10]

New Orleans, Louisiana, this <u>1st</u> day of <u>  August  </u>, 2012.

<u>Alma L. Chasez</u>
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[10]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.